**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America,** | ) | **CASE NO. 5:12 CR 286** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Dante L. Branch, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendant Dale Colbert's Motion to Suppress His Intercepted Communications (Doc. 152), defendant Darryl Colbert's Motion to Suppress Title III Wiretap Evidence with Request for Franks Hearing (Doc. 160), defendant Jeremy Duncan's Motion to Suppress His Intercepted Cell Phone Conversations (Doc. 162), defendant Darin Wright's Motion to Join Defendants Dale Colbert's and Darryl Colbert's Motions to Suppress (Doc. 166), defendant Antowan Logan's Motion to Suppress His Intercepted Communications (Doc. 167), defendant Wesley A. Black's Motion to Join the Motions to Suppress Filed on Behalf of Defendants Dale and Darryl Colbert (Doc. 168), and defendant Louis Harmon's Motion to Join Co-Defendant Colbert's Motion to Suppress (Doc.

1

199).  For the following reasons, all motions are DENIED.

**Discussion**

Defendants were indicted on drug charges.  Moving defendants seek to suppress evidence obtained as a result of various Title III wiretap Orders issued by United States District Court Chief Judge Solomon Oliver Jr. and, on one occasion, United States District Court Judge James S. Gwin.  The interception warrants are for Target Telephone 1 through 10 (hereafter, TT-1 through TT-10) identified as follows:

[TT-1] LOUIS D. HARMON

[TT-2] DANTE BRANCH

[TT-3] LOUIS D. HARMON

[TT-4] DARRYL A. COLBERT

[TT-5] DARRYL A. COLBERT

[TT-6] DALE E. COLBERT

[TT-7] DANTE L. BRANCH

[TT-8] DERRICK WATSON

[TT-9] JEREMY S. DUNCAN

[TT-10] DALE E. COLBERT[1]

Orders were signed on the following dates: December 7, 2011 (Government Ex. 1), January 5, 2012 (Government Ex. 2), January 20, 2012 (Government Ex. 3), February 18, 2012 (Government Ex. 4), March 19, 2012 (Government Ex. 5), and May 3, 2012

---

[1]    More than one telephone was used by defendants resulting in more than one Target Telephone.

2

(Government Ex. 6).

Each of the motions challenge the "necessity" component of various Title III Orders and the probable cause requirement that defendants had committed a drug trafficking crime. One motion asserts that investigators failed to "minimize" intercepted conversations. One motion requests a *Franks* hearing.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. §§ 2510–2522, sets out the requirements and provisions relating to wiretapping. Title III establishes a multi-tiered approval process for obtaining a wiretap. First, an application for an interception order must be approved by the Attorney General or a high ranking Department of Justice Official. Second, a law enforcement officer must present the application to a federal judge for approval. 18 U.S.C. §§ 2516, 2518.

Title III interceptions must meet the "necessity requirement." "Under § 2518, a law-enforcement official's application for wiretap authority must contain 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.' " *U.S. v. Wolcott*, 483 Fed.Appx. 980 (6th Cir. 2012) (quoting 18 U.S.C. § 2518(1)(c)). "The necessity requirement ensures that a wiretap is not used as the initial step in a criminal investigation, or is otherwise resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Id.* (internal quotations omitted) (citing *United States v. Rice,* 478 F.3d 704 (6th Cir. 2007), *United States v. Giordano*, 416 U.S. 505 (1974), *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir.1988)). "Accordingly, the application must demonstrate that the government gave serious consideration to the non-wiretap techniques prior to applying for

wiretap authority and explain why, under the particular circumstances at hand, such techniques would be, or had already proven to be, inadequate." *Id.* (internal quotations omitted) (citing *United States v. Stewart,* 306 F.3d 295 (6th Cir. 2002), *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir.1985)). "Nonetheless, the government need not prove the impossibility of other means of obtaining information, and, relatedly, the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Id.*

Additionally, under 18 U.S.C. § 2518, the issuing judge approving a wiretap must determine on the basis of facts submitted by the applicant that there is probable cause "for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [§] 2516" and "for belief that particular communications concerning that offense will be obtained through ... interception." "A reviewing court assesses the application on the totality of the circumstances and in a reasonable and common sense manner." *United States v. Jackson,* 454 Fed.Appx. 435 (6th Cir. 2011) (citing *United States v. Alfano,* 838 F.2d 158, 162 (6th Cir.1988) (noting that "[t]he basic standards for a wiretap are similar to those for a search warrant"). "A reviewing court affords great deference to the issuing judge's determination of the circumstances at the time of issuance." *Id.* (citing *Alfano*, 838 F.2d at 162).

Finally, the "minimization" requirements of § 2518(5) must be met. Title III requires that surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). "To warrant suppression for want of proper minimization, defendants must show that monitoring agents

4

exhibited a high disregard for defendants' privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions." *United States v. Haque,* 315 Fed.Appx. 510 (6th Cir. 2009) (internal quotations omitted) (citing *United States v. Feldman*, 606 F.2d 673, 679 (6th Cir.1979))."The minimization statute is deemed to be satisfied if on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *United States v. Feldman*, 606 F.2d 673, 679 (6th Cir.1979) (internal citations and quotations omitted). The defendant bears the burden of production and persuasion in challenging the Government's compliance with the minimization requirement. *Id.; United States v. Giacalone*, 853 F.2d 470, 483 (6th Cir.1988).

"To suppress Title III intercepts based on misstatements and/or omissions in the underlying affidavit, a defendant must show by a preponderance of the evidence that (1) the misstatements or omissions were deliberately or recklessly made, and (2) but for those misstatements or omissions, the affidavit would lack the requisite probable cause to sustain the warrant." *United States v. Haque,* 315 Fed.Appx. 510 (6th Cir. 2009) (citing *United States v. Charles*, 138 F.3d 257, 263 (6th Cir.1998), *Franks v. Delaware*, 438 U.S. 154 (1978)).

The Court addresses the motions in the order in which they were filed. As an initial matter, moreover, some of the defendants challenge the wiretap Orders concerning TT-I (Louis Harmon) but, as the government points out, defendants were not intercepted over that line and they lack standing to challenge it. *United States v. Dickerson,* 651 F.Supp.2d 739 (N.D.Ohio 2009) (citations omitted) ("The defendant only has standing as to conversations in which he participated, or which occurred over a telephone belonging to him: the fact that he was named in orders, but not intercepted does not give rise to standing.") Subsequent to the

5

briefing of the other defendants' motions and the government's combined response, Louis Harmon filed his Motion to Join Co-Defendant Colbert's Motion to Suppress in an apparent recognition of defendants' lack of standing to challenge the wiretap orders relating to Harmon.  However, Harmon does not present his own analysis or point to any particular deficiencies in those Orders or affidavits.  Nevertheless, the Court agrees with the government, and adopts the reasoning set forth by it, that Porrini's affidavit established a substantial basis for the issuing judge to find probable cause and necessity for issuing the Orders.

**(A) Dale Colbert's Motion to Suppress His Intercepted Communications**

Dale Colbert challenges the affidavit in support of wiretapping his telephone (TT-6). He argues that necessity has not been shown as the affidavit fails to establish that traditional investigative techniques were tried, but failed.  Defendant contends that the government's investigation of him was limited to the following: Law enforcement learned through CS (confidential source)-6 that a California shipping company, Ortega, shipped drugs through YRC Delivery to Massey's located at 1338 Newton, Akron, Ohio.  Dale Colbert was then observed at that address.  Several bank accounts were subpoenaed but information was not received.   A search warrant was executed for a package shipped from a person in California to Massey in Akron through YRC, and cocaine was found. Law enforcement was informed by an employee of YRC that YRC informed an unnamed person that law enforcement seized the shipment. Certain incoming and outgoing calls were subpoenaed, and telephone toll analysis and subscriber checks was done.  Defendant contends that while law enforcement was aware of his address in California, it did not do a trash pull, conduct any surveillance, or look into

6

any bank accounts. Nor did law enforcement talk with anyone from Ortega, the alleged distribution point for the drug shipments, or with anyone from YRC, the alleged shipper. Defendant asserts that while the affidavit states that traditional investigative techniques were tried but failed, only boilerplate reasons (applicable to any narcotics investigation) are given as to why these techniques were not used.

Defendant also argues that the affidavit does not establish probable cause to believe that he committed a drug trafficking crime because the affidavit relies on six confidential sources and previous wiretap interceptions, but the only informant connected to him (CS-6) knows nothing about him.

Finally, defendant asserts that the government failed to follow proper minimization in his case in that it recorded a number of personal, non-criminal conversations.

For the following reasons, the Court disagrees that the affidavit fails to establish necessity, probable cause, or minimization.

On March 19, 2012, Judge Oliver signed the Application for an Order Authorizing Continued Interception of Wire Communications To and From [TT-2] and Initial Interception of Wire Communications To and From Cellular Telephone Facilities [TT-6], [TT-7], and [TT-8]. (Government Ex. 5)[2] The Application is supported, *inter alia,* by the 129 page affidavit of Special Agent (SA) Douglas Porrini. As discussed immediately below, the affidavit provides a detailed explanation, applicable to the facts of this case, as to what investigative techniques had been used, and why other types would be unsuccessful if tried. Thus, Judge Oliver had a

---

[2]     Although Dale Colbert was the subject target of the May 3, 2012 Order as well, he does not specifically challenge that Order.

substantial basis to find necessity.

While the application for a wiretap order must contain a full statement as to whether other investigative procedures were tried and failed, would be unlikely to succeed, or would be too dangerous, "the government need not prove that it has exhausted every conceivable conventional investigative method." *Dickerson, supra* (citing *U.S. v. Alfano*, 838 F.2d 158, 163 (6th Cir.1988)). "What matters is that the government inform 'the issuing judge of the difficulties involved in the use of conventional techniques.' " *Id.* (citing *U.S. v. Stewart*, 306 F.3d 295, 304 (6th Cir.2002)).  The burden of showing necessity is not a heavy one, and a wiretap need not be used only as a last resort.  All that is required is that law enforcement first give serious consideration to the non-wiretap techniques, and that the court be informed as to why they have been or would likely be inadequate.  While a purely conclusory affidavit unrelated to the facts of the case at hand does not comply with the statute, an application meets the necessity requirement where it gives a reasonable statement of the consideration or use of the other investigative means.  A court evaluates that showing in a "practical and common sense fashion."  *United States v. Gentry,* 2012 WL 2947589 (M.D.Tenn. July 19, 2012) (citing *United States v. Giacalone,* 853 F.2d 470 (6th Cir. 1988), *Alfano, supra, U.S. v. Landmesser*, 553 F.2d 17 (6th Cir. 1977), and *United States v. Rice,* 478 F.3d 704 (6th Cir. 2007)).

Porrini's affidavit outlines his relevant experience and the previous Orders authorizing interception of wire communications in this matter. Porrini also summarized the investigation up to that time which included the seizure of seventeen kilograms of cocaine from an engine block sent to an Akron address from California.  Affiant sets forth in detail the objectives of

8

the investigation.  In sum, Porrini stated the "overall objective of [the] request for authority to intercept wire communications over" TT-6, as well as the others identified in the Application, was to:

> (1) discover the identities and communications facilities used by the drug associates of the Colberts and Branch, with a primary emphasis on the Colberts' dealings with their unknown cocaine/marijuana supplier(s); (2) discover the identities and communications facilities used by the drug associates of Treggs, Duncan, Watson and Branch, with a primary emphasis on Treggs' dealings with his unknown marijuana supplier(s); (3) uncover the modus operandi of the Colbert and Treggs DTOs [drug trafficking organizations]; and (4) gain evidence to prove the connection, participation, and role of all Colbert and Treggs coconspirators in the criminal activity- in a concerted effort to completely dismantle the DTOs of which they are a part.

Contrary to defendant's assertion, the affidavit establishes the requisite necessity and does not reject traditional techniques in a terse or boilerplate manner, but in a manner tailored to the current need for expanding the wiretap. In particular, Porrini stated that while the initial focal point of the investigation had been Dante Branch's relationship to a California to Ohio marijuana trafficking enterprise involving Anthony Treggs, Derrick Watson, Dennis Hunter and Jeremy Duncan, as the investigation unfolded it was discovered that Branch also had current ties to a significant, multi-state cocaine venture involving Dale and Darryl Colbert (twins).  While the investigation and Title III interceptions had revealed aspects of both of these DTOs, "additional investigation [was] needed - especially with regard to the Treggs DTO." Additionally, the affidavit states:

> 85. Title III interceptions over [TT-2] to date have been productive; however, continued Title III authority over this facility does not negate Affiant's request to commence interceptions over [TT-6], [TT-7] and [TT-8] for several reasons. First, DANTE L. BRANCH is known to have at least three cellular telephones, including

9

[TT-2] and [TT-7]; therefore, it is not guaranteed that
communications between BRANCH and the COLBERTS will be
captured over [TT-2]. Moreover, BRANCH has indicated in
intercepted conversations over [TT-2] with FNU LNU #6
and DALE E. COLBERT, that his "other" telephone - that
is newly acquired [TT-7] - is his "work" (drug
business) telephone - although Affiant and his
colleagues continue to intercept pertinent narcotics
related conversation over [TT-2], and believe BRANCH
will continue to use all of his cellular telephones
with regard to his drug business. More importantly,
interceptions over [TT-2] will not capture telephonic
communication between DARRYL A. COLBERT and DALE E.
COLBERT and their other criminal associates in
Northeast Ohio, California (especially the
supplier(s)), and elsewhere. Access to those
communications is essential if Affiant and his colleagues are to expand this
investigation to the COLBERTS' supplier(s) and other significant drug associates.

And,

[C]ourt authorized interceptions over DARRYL A.
COLBERT's [TT-4] and [TT-5] were helpful in revealing
certain aspects of the DARRYL and DALE COLBERT DTO.
However, these two cellular telephones have been
jettisoned in favor of new cellular "work"
telephone(s). Thus continued authority of these
telephones would not be of value. Moreover, it appears
that while they are "partners" to a certain extent, it
is DALE E. COLBERT who looks to be the primary contact
with DALE and DARRYL's cocaine supplier. Therefore,
authority to intercept wire communications over [TT-6]
is essential if the investigation is to expand to level
of the California cocaine and marijuana supplier(s).

Over the course of 31 paragraphs, Porrini addressed traditional investigative

techniques, which had been tried and failed, or were reasonably unlikely to succeed if tried, or

were too dangerous to employ.

Porrini first addressed surveillance.  He stated that while law enforcement officers

continued to conduct physical surveillance over the past thirty days, coordinated through Title

III interceptions, which led to "positive developments," this technique had "severe limitations." Due to "the secretive nature of drug dealing, and the lack of discernable routine, it is almost impossible to identify times and locations where criminal activity it apt to occur." He noted that the mere observation of individuals meeting, or the haphazard following of subjects offered no significant benefit to the investigation, and he gave a specific example which occurred on January 30, 2012. Porrini also set out specific surveillance operations which occurred on February 21-23, 2012, in conjunction with Title III interceptions, but concluded that while physical surveillance had been beneficial to some degree, this technique, overall, had "proved ineffective in securing evidence sufficient" to convict principal participants of the two DTOs.  He stated, "Without advance, specific information about their whereabouts, surveillance of the principal members cannot be effectively conducted. Surveillance efforts, whether "fixed" or "drive-by," over the past several months have not resulted in any meaningful evidence of criminal activity. Finally, Affiant believes it too risky to use extensive surveillance because of the caution exhibited by the DTO members" and he provided an example. Porrini stated his belief that further physical surveillance, conducted without the support of wire interceptions, may compromise the investigation because prolonged surveillance increases the opportunity for detection.

Porrini also reported that law enforcement officers had installed pole cameras on January 8, 2012 at Dante Branch's car wash in Akron and on February 6, 2012 at the warehouse located on Bank Street in Akron, and that attempts were being made to have a pole camera installed at Ortega's Polishing Shop in Ontario, California. Affiant stated that while data from the pole cameras had some usefulness, this technique suffered from limitations.  He

11

provided several specific examples, and concluded that "while the use of pole cameras in this investigation may be of some assistance, it fails - as a single technique - in providing the type of evidence necessary to attack these two DTOs."

Electronic tracking techniques were also addressed, but rejected "as evidence in and of itself of criminal activity."  In particular,"The data is assisting surveillance units in locating BRANCH, DALE COLBERT, DARRYL COLBERT, DARIN WRIGHT and LOGAN - which is of some value; however, their location alone is insufficient to reveal actual criminal conduct. Again, it is only through the context of intercepted conversations that meaning is derived from the location of these individuals." As to mobile tracking of vehicles, the affiant reported the "practical problems" of using the technique in this investigation, as well as the unacceptable risk of using it, given the suspicions of some of the targets.

Second, Porrini discussed the use of confidential sources.  He stated that CS-1, CS-2, and CS-3 no longer were cooperating, and that while CS-4, CS-5, and CS-6 had provided useful information since the Title III investigation commenced, "The information [was] not sufficient to lead to attainment of the investigation's overall objectives."    With regard to CS-6, the source "had valuable information about the Coberts' general operation, but was never in a position to know the specific, inner workings of the DTO, or all the players involved." He provided a specific example.  Porrini further stated that he and "his colleagues continue to hunt for persons who might be able to shed light on the inner workings of the two targeted DTOs - but none have been found and/or developed at this time."

Third, Porrini addressed grand jury investigation and set forth the reasons, advised by

12

the Assistant U.S. Attorney, that this would be unlikely to be successful in achieving the investigation's goals.

Fourth, Porrini discussed in detail why he did not believe interviewing persons with respect to these DTOs would effectively advance the goal of identifying the main suppliers of the cocaine and marijuana for either DTO.  He averred in particular:

> While additional evidence against LOUIS D. HARMON, DANTE L. BRANCH, DARRYL A. COLBERT, DALE E. COLBERT, and others has been secured since Title III authority was initiated on December 07, 2011, Affiant does not believe confronting any of these principal target subjects at this point would lead to the achievement of investigatory goals. First, the only "hard evidence" (actual controlled purchases and/or seizures of controlled substances or drug proceeds) that has been secured prior to March 12, 2012, is a one pound marijuana purchase[d] from HARMON. On March 12, 2012, seventeen kilograms of cocaine were seized, based in large part, on Title III interceptions. This seizure, along with earlier Title III interceptions around February 21, 2012, is compelling evidence of the COLBERTS' drug trafficking. However, to convince DALE E. COLBERT, DARRYL A. COLBERT, and/or DANTE L.BRANCH of their personal peril, the Title III would have to be revealed. If any one of these Target Subjects refused to cooperate (and instead notified criminal associates), the entire investigation into BOTH the COLBERT and the TREGGS DTOs would come to a premature end. Also, Affiant cannot be certain (or even confident) that the COLBERTS would provide information about their cocaine/marijuana supplier(s).

After discussing the possibility of approaching other known (and unknown) associates of the principal targets, Porrini concluded:

> For the reasons set forth above, Affiant does not believe interviewing persons with respect to these two DTOs would be effective. Because of the apparent "cross-over" between these two DTOs, should the existence of the Title III wiretap be revealed, it almost assuredly ends both investigations. Therefore, interviews are not a viable investigative technique at this time.

Fifth, Porrini reported that he had reviewed toll records for cellular telephone facilities [TT-2], [TT-6], [TT-7], and [TT-8], as well as toll information pertaining to other telephone

13

numbers associated with these DTOs, but that such efforts failed to significantly advance the

investigation. He noted that drug traffickers often change communication devices, and that

had been the case here.  Porrini provided specific observations.

> Sixth, Porrini discussed the limitations of trash searches:

> On several occasions prior to obtaining Title III  authority, "trash searches" were
> attempted at the residence of LOUIS D. HARMON, located at 1415 Dietz Avenue,
> Akron, Ohio. On four separate trash days (the last being November 2, 2011),
> investigators went to HARMON's residence to conduct a trash search and no trash was
> visible on the curb. One trash search was attempted at BRANCH's residence, located
> at 838 Kennebec Avenue, Akron. Investigators were unable to conduct a search of the
> trash due to the use of motion detector lights operating at the residence. The
> investigators did not want to risk being compromised. Affiant believes that law
> enforcement would risk detection if they were to attempt a search of either HARMON
> or BRANCH's residences. Even if a trash search could be successfully conducted at
> these locations, Affiant does not believe it would yield significant evidence. Based
> upon training and experience in investigating high-level traffickers, Affiant has found
> that such targets go to great lengths to destroy possible incriminating evidence and
> frequently will not use their residential trash containers to dispose of valuable
> information. Affiant knows that it is common for traffickers to carry trash away from
> their residences and place it in commercial dumpsters to avoid having it examined by
> law enforcement. Therefore, at this time, Affiant does not believe that trash searches
> are feasible, practical, or will result in the attainment of the goals of this investigation.

> Last, Porrini addressed search warrants, concluding that he did not believe "use of

search warrants at this time would provide sufficient evidence to determine the full scope of

these drug trafficking enterprises, the identities of all co-conspirators, and the various

methods used to operate this enterprise, especially as it pertains to the COLBERT and

TREGGS

DTOs." He noted that law enforcement lacked specific information as to locations used by

members of these DTOs for storage of drugs. And, the principal targets may not "hold" drugs

for any appreciable amount of time.  He provided a recent case specific example.  Porrini

additionally stated that it was his experience that "narcotics dealers generally keep only

14

limited records on details of their daily narcotics activities."  While a "documents" search

warrant could be obtained, "it is highly unlikely that any seized documents, records or

papers, even if incriminating, would be of sufficient evidentiary value alone, or in conjunction

with other presently possessed evidence, to prosecute persons identifiable from the records."

Also, searching some of the targets' residences only would serve to alert the principal

members of these DTOs of law enforcement interest.

In sum, Porrini concluded that while he and his colleagues continued to consider these

traditional investigative techniques, and have used them where appropriate, they could not in

and of themselves "reasonably lead to the type and quantity of evidence necessary to prove

the connection, participation, and role of substantially" all of the participants of these two

DTOs.

It is apparent from this discussion that Porrini comprehensively, and with case specific

discussion, addressed why traditional investigative techniques had been or were likely would

be unsuccessful in attaining the stated overall objectives of the investigation.  The affidavit

more than adequately details the investigative techniques that law enforcement used previous

to seeking the wiretap, and why they failed or were unlikely to succeed.  The Court is

satisfied that the affidavit demonstrates the government's serious consideration to the non-

wiretap techniques and that Judge Oliver was well-informed of the reasons for the

investigator's belief that such techniques had been or would likely be inadequate.  Viewed in

a common sense and practical manner, Porrini's assertions demonstrate that the government

sufficiently considered non-wiretap techniques prior to applying to Judge Oliver for the

authorization to wiretap.  The affidavit as a whole clearly contained substantial basis for a

15

finding of necessity.

Defendant also briefly argues that the affidavit does not establish probable cause to believe that he had committed a drug trafficking crime, i.e., the transportation of drugs across state lines.  He notes that the affidavit relies on six confidential sources and previous wiretaps interceptions, but that the only informant connected to him, CS-6, knows nothing about him. The Court disagrees given that a common sense reading of the affidavit shows that probable cause was established. The affiant set forth information provided by CS-6 pertaining to Dale and Darryl Colbert:

> [T]he COLBERTS have been importing large amounts of cocaine to the Canton/Akron area from California since the summer of 2010. CS-6 has witnessed nine or ten loads of cocaine arrive in the Canton area since the shipments began. According to CS-6, the COLBERTS have engine blocks delivered to several warehouses in the area from a
> location in California. The bills of lading associated with the deliveries show the shipper to be Ortega's Polishing Shop, with an address of 1127 W. State Street, Ontario, CA 91762. According to CS-6, the engine blocks contain 10-15 kilograms of cocaine which are hidden inside each engine block. CS-6 also has observed vests, the type used by X-ray technicians, lining the engine blocks. The COLBERTS advised CS-6 that the vests were lead to prevent the engine blocks from being x-rayed by law enforcement. The cocaine was removed by either DARRYL or DALE COLBERT, and then distributed in the area. The engine blocks are then loaded with currency, profits from the cocaine sales, and shipped back to California. CS-6 was receiving 5 kilograms from each load, with the rest of the cocaine being distributed to unknown persons in the Akron and Canton area by either DARRYL or DALE COLBERT. CS-6 knows the same type of shipment is arranged by the COLBERTS to unknown destinations in St. Louis and Tennessee. CS-6 knows the COLBERT brothers live in California and come to Ohio when a shipment of cocaine is arriving, or money is being sent back to California. On January 27, 2012, CS-6 telephonically reported to investigators that he had been contacted by one of the COLBERT brothers (again who are twins), who was calling from (760) 605-5652. According to CS-6, the unknown brother advised that his brother was coming into town in the next few days. [Affiant believes this call was from DALE E. COLBERT, as other intercepted calls prior to January 27, 2012, confirmed that DARRYL A. COLBERT was arranging travel to Ohio - and did in fact travel to Ohio - as reported by CS-6.] During previous trips, when CS-6 was notified that one of the COLBERTS was coming into town, the cocaine showed up soon thereafter. CS- 6 does not know the location where the

16

cocaine will be delivered if delivered to the area.

Porrini then stated that deliveries of engine blocks from Ortega's were confirmed to a Canton business in the second half of 2011, and that an engine block was shipped from Ortega's to Massey & Sons in Akron in February 2012. Dale Colbert was observed at that business during the delivery.  Additionally, the affidavit included numerous previously intercepted telephone conversations involving this defendant in 2012 placed on Darryl Colbert's targeted telephones.  The Court agrees with the government that based upon the totality of the circumstances and applying a reasonable and common sense approach, the affidavit established probable cause.

Lastly, this defendant asserts that the wiretaps failed to follow proper minimization and personal and non-criminal conversations were recorded. However, no discussion or analysis is offered and he fails to satisfy his burden of proving a violation.

For these reasons, defendant Dale Colbert's Motion to Suppress His Intercepted Communications is denied.

### (B) Darryl Colbert's Motion to Suppress Title III Wiretap Evidence with Request for Franks Hearing

Darryl Colbert argues that the affidavits in support of the warrants which authorized the interception of his telephone calls, and those upon which his conversations were obtained, did not meet the necessity requirements because they did not establish that traditional investigative techniques were sufficiently exhausted before the government requested the wiretaps. In particular, defendant challenges the necessity of the January 20, 2012 Branch wiretap, the February 18, 2012 continued Branch wiretap and Darryl Colbert wiretaps, the March 19, 2012 continued and new Branch wiretaps and Dale Colbert wiretap, and the May

17

3, 2012 continued Branch wiretap and Dale Colbert wiretap. He also challenges probable cause as to the wiretap of February 18, 2012.  Finally, he argues that since the wiretap application affidavits contained recklessly made materially false statements, a *Franks* evidentiary hearing is necessary.

### (i) January 20 Order[3]

Defendant challenges the necessity of Judge Oliver's January 20, 2012 Order authorizing the interception of the wire communications of Dante Branch's cellular telephone and a new telephone used by Louis Harmon (Government Ex. 3) based on the following assertions in SA Porrini's affidavit.

Defendant asserts that the affidavit falsely stated that Branch and Darryl Colbert were affiliated with the Los Angeles, California based "East Coast Crips Street Gang."   It falsely stated that in October 2010 Darryl Colbert was stopped during an investigative traffic stop, and was found with over $10,000.00 cash and what appeared to be "a drug ledger along with Hispanic names and bank account numbers," and that during the stop, Colbert provided a California driver's license with the name "Dale Colbert."  Finally, it falsely stated that there was probable cause to believe that there was a substantial DTO operating from Los Angeles, California and Akron, Ohio, involving current and/or past members of the Crips Street gang.

Defendant asserts that these recklessly false statements conveyed to Judge Oliver the impression that traditional investigative techniques would be too dangerous based upon the character of Branch and Darryl Colbert.

---

[3]     Darryl Colbert and Jeremy Duncan challenge this Order.  They have standing to do so given that they were intercepted over Branch's telephones.

The affidavit contained an analysis of previously intercepted Title III conversations which uncovered no conversations which explicitly dealt with (as opposed to Porrini's interpretation) the subject of drugs or drug trafficking. The affidavit contains no mention of the use of weapons, violence, or violent threats in any of the conversations involving Dante Branch. Thus, it omits the fact that there is no indication of violent behavior.

The affidavit used generic boilerplate language in asserting that traditional investigative techniques were not reasonably likely to identify the major participants of this DTO, and result in sufficient evidence to prove the means by which the marijuana and/or cocaine is delivered into the Akron, Ohio by this DTO, and that traditional techniques have been tried and failed, or were too dangerous to employ. And, it used reasoning that could always be argued in every type of criminal case when stating that normal investigative procedures have been tried and have failed to produce sufficient evidence to successfully prosecute all of the persons involved, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to employ.

The affidavit discussed surveillance, confidential sources, undercover investigation, grand jury investigation, interview of suspects, toll records and pen register analysis, trash searches, and search warrants.  But the affidavit showed that these attempts were either not tried or should have been exhausted where tried. Generally, defendant contends that the traditional investigative methods that were tried were working, and that the government sought out a wiretap because it was an easy and effective way to obtain evidence.

For the following reasons, the Court agrees with the government that defendant's assertions should be rejected.

Defendant offers no proof of the alleged false statements, or any support for his assertions.  Nor did Porrini assert that gang affiliation or violent behavior were factors to be considered in evaluating necessity.  Additionally, Porrini's affidavit contains a comprehensive and case specific discussion, not boilerplate, as to why traditional investigative techniques had been or likely would have been unsuccessful in attaining the overall objectives of the investigation.  Each of the successive affidavits detailed the progress of the expanding investigation which lead to the wiretaps of Darryl Colbert's cellular telephones. While defendant (and Jeremy Duncan in his motion) parse each technique and contend that more should have been done with the techniques that were working, and attempts should have been made with those that were deemed non-viable, the Court agrees with the government that a "hyper-technical and speculative analysis" is inappropriate.  Rather, the affidavit is assessed in a practical and common sense fashion.

Porrini's affidavit addressed the need for interception over the course of 28 detailed paragraphs, including a discussion of each traditional investigative technique.

First, he discussed surveillance.  He stated that physical surveillance of Harmon, Branch, and others had been conducted and led to some positive developments in identifying some who may be involved with this DTO, but that it had severe limitations: "Because of the secretive nature of drug dealing, and the lack of any discernable routine, it is almost impossible to identify times and locations where criminal activity is apt to occur. The mere observation of individuals meeting, or the haphazard following of subjects offers no significant benefit to the investigation."  He then provided a specific example from December 14, 2011, which showed that "without intercepted conversations over [TT-1], investigators

would not have known about either of these meetings, and even if surveillance units

had been lucky and captured the meetings, their meanings would have been unknown.

Therefore, wire interception over [TT-2] and [TT-3] is essential to make physical surveillance

effective, and thus provide opportunities for the interdiction of marijuana, cocaine or

proceeds."

Porrini also noted the  risk of detection associated with physical surveillance and

again gave specific examples.

Porrini reported that a pole camera had been installed at Branch's Akron carwash, and

stated that while these can be useful in certain circumstances, "without interceptions over

[TT-2] it will be almost impossible to distinguish between customers using the car wash and

drug related meetings." He also noted other specific shortcomings with this method and that

"prior to obtaining Title III authority, Affiant was not able to identify any specific location

that was of paramount importance to the operation of the HARMON or BRANCH DTOs.

That

situation has not changed since first obtaining Title III authority on December 7, 2011."

Porrini addressed GPS or cell site tracking of cellular telephones, and noted the

limited value by providing a case specific example.

Second, Porrini comprehensively addressed confidential sources:

Since obtaining Title III authority on December 07, 2011, Affiant and his colleagues
have received additional information from CS-4 and CS-5. The information has been
useful, but is not of the type that can lead to attainment of the investigation's overall
objectives.

As explained in previous Affidavits, CS-1, CS-2, and CS-3 are no longer viable
providers of information - and none of them had knowledge of BRANCH's activities
with the HUNTER DTO. CS-4 and CS-5 remain active cooperators; however,

21

although CS-4 has had a sustained, and substantial drug relationship with HARMON (primarily cocaine), CS-4 was never able to position himself so as to obtain specific and timely information on HARMON's drug dealing. Furthermore, CS-4's ability to gain "inside" information has been compromised by virtue of the recent drug arrest, of which HARMON and his closer associates are aware. CS-4 has been unable to establish a drug relationship with BRANCH, and receives much of his information about BRANCH from HARMON. Therefore, while CS-4 has almost daily contact with HARMON and/or other members of HARMON's DTO, he is unable to obtain anything other than general information. CS-5's information pertains only to the activities of DENNIS S. HUNTER and JEREMY S. DUNCAN. CS-5 is not in a position to contact, meet or converse directly with any of the Target Subjects operating in the Akron, Ohio area. Finally, although CS-5 is able to obtain general narcotics related information, he is not in a position to make controlled buys from either HUNTER or DUNCAN. Affiant and his colleagues continue to look for persons who might be able to shed light on the inner workings of the cocaine and marijuana trafficking activities of HARMON, BRANCH, and their associates - but none have been found and/or developed.

Third, Porrini discussed the general limitations of undercover investigations, and then specifically noted that none of the interceptions over Harmon's targeted telephone suggested that he dealt with strangers. Rather, the intercepted drug related conversations showed that Harmon was very familiar with his customers, and met at "normal" or previously understood spots. While defendant complains that no undercover operation was undertaken, Porrini noted that CS-4 was not in a position to introduce an undercover agent into the DTO since that source was not in a position to purchase drugs from BRANCH himself.  In sum, undercover activity would not be successful in fully identifying members and distribution practices of the venture, or otherwise satisfy the goal of dismantling the larger operation.

Fourth, grand jury investigation was rejected for the specific reasons set forth in the affidavit which were based upon the advice of the Assistant U.S. Attorney.

Fifth, the affiant stated at length why he believed interviewing persons with respect to this drug trafficking enterprise would be ineffective based on his past experience and

22

specifically:

> While some additional evidence against [Harmon] and [Branch] has been secured since December 07, 2011, by virtue of the wire interceptions over [TT-1]... Affiant does not believe confronting Harmon or Branch at this point would lead to the achievement of investigatory goals. First, the only "hard evidence" (actual controlled purchases or seizures of controlled substances or drug proceeds) that has been secured is a one pound marijuana purchase from Harmon. The new evidence has consisted almost exclusively of Title III interceptions. This information has been limited -primarily since neither Harmon nor Branch have been in possession of substantial stashes of cocaine/marijuana ... Even in conjunction with the historical information, the new evidence is not reasonably likely to persuade either individual to cooperate. Confronting either individual with the wiretap evidence alone obviously reveals the existence of the investigation (prematurely) and is not likely to convince either person of personal peril. As noted in the previous Affidavits, Parker, Williamson, and Branch were members of Harmon's wedding party, which evidences an extremely close personal relationship between them. Affiant believes if they were approached, law enforcement would most likely have to reveal specific details of any significant case against them (which really doesn't exist) and/or Harmon in order to obtain their cooperation. Additionally, conversations intercepted over [TT-l] have shown Harmon has a close personal relationship ... Affiant believes it is much more likely any such contact would be communicated to other members of the DTO, thereby compromising the integrity of the investigation...

Affiant also stated that investigators involved with Terrance Tarver were not prepared to risk their overall investigation by approaching him at that time.

Sixth, toll records and pen register analysis were addressed but noted that "telephonic contact in and of itself does not identify the actual person(s) participating in the communication with Harmon and Branch. Interception of wire communications over [TT-2] and [TT-3] will likely reveal the identities of persons who to date have not been identified, and reveal the true nature of their conversations with Harmon and Branch."

Seventh, Porrini addressed trash searches as in the affidavit above.  Finally, the affiant specifically stated why the use of search warrants would not provide sufficient evidence to determine the full scope of the drug trafficking enterprise, the identities of all co-conspirators,

23

and the various methods used to operate the enterprise.  In particular, CS-4 was not aware of

the locations used by Harmon or Branch to store narcotics, and no other locations had been

identified by investigators that would justify the execution of a search warrant.  "Moreover, it

is clear that it has been difficult for the DTO to obtain large quantities of controlled

substances over the past thirty days. Title III interceptions and source information suggest this

will change sometime after January 1, 2012 - but there is no clear indication of when or where

those drugs will be stashed."  Affiant also stated his belief, and the basis thereof, that Harmon

and Branch  may not "hold" drugs for any appreciable period of time. And, affiant had no

specific information that Harmon and Branch kept detailed documentation of their

transactions, and documents seized would not, in themselves, be sufficient to prosecute.

Finally, a search would likely only serve to alert the targets of the investigation,

but would not be adequate to sustain a successful prosecution of a majority of the members of

the drug operation.

Defendant argues that as of the time of the January 20 application, Porrini and the

government

> would clearly have believed that there was sufficient probable cause for the issuance
> of search warrants targeting Branch, Harmon, and other members of the drug
> trafficking conspiracy that it was investigating. It flies in the face of logic to suggest
> that search
> warrants executed simultaneously against Harmon, Branch et al., based on
> information provided by the Government's confidential sources and other forms
> of traditional investigative techniques, would not have been fruitful. And, upon
> obtaining additional evidence against Branch and Harmon, the odds that either or
> both of them would become cooperators, and agreed to work with investigators,
> give interviews, or testify in front of a Grand Jury would have increased
> exponentially.

(Doc. 161 at 15-16).  But, defendant does not identify specific locations or particular other

24

members of the conspiracy, and fails to refute Porrini's averment that investigators lacked specific knowledge of where the drugs or proceeds were kept or when they were likely to be present.  Nor does he address how the execution of a search warrant as to Harmon and Branch would harm the overall investigation into the DTOs.

As with the affidavit above, there was a substantial basis for Judge Oliver to find necessity when issuing the January 20, 2012 Order .  The affidavit demonstrates that the government gave serious consideration to the non-wiretap techniques prior to applying for wiretap authority, and Judge Oliver was informed of the reasons for the affiant's belief that the non-wiretap techniques would have been, or would likely have been, inadequate.

### (ii)  February 18, 2012 Order

Next, defendant challenges the February 18, 2012 Order signed by Judge Oliver authorizing the continued wiretap of Branch's cellular telephone and his own two cellular telephones.  (Government Ex. 4) Again, the Application was supported by the affidavit of SA Porrini. Defendant challenges necessity and probable cause.

Porrini stated the current objectives of the continued investigation:

During the investigation conducted to date,
Affiant has learned that DANTE L. BRANCH is
currently in contact with two significant DTOs.
First, BRANCH has had contact with DARRYL A.
COLBERT and DALE E. COLBERT, known cocaine
traffickers out of California. Secondly, BRANCH
has had contact with a marijuana trafficking group
from California, apparently headed by ANTHONY L.
TREGGS and/or DUNCAN S. HUNTER.

With regard to the COLBERT DTO, Affiant and his
colleagues have intercepted conversations over
[TT-2] between DANTE L. BRANCH and DARRYL A.
COLBERT, using [TT-4], in which COLBERT and BRANCH

25

discussed a female in the Canton, OH area who was
in possession of drugs (believed to be cocaine).
BRANCH advised COLBERT that she showed him "one"
(believed to be a kilogram) to which COLBERT
replied that there should have been more than
that. During the same conversation BRANCH and
COLBERT discussed COLBERT's intended arrival into
the Akron/Canton area on January 26, 2012.

Based on information provided by CS-6, intercepted
Title III communications, and other investigation,
Affiant believes DARRYL A. COLBERT arrived in the
Akron area to arrange for a shipment of cocaine
from California to the Akron/Canton area.
Interceptions over [TT-1] and [TT-2] revealed
DANTE L. BRANCH advised LOUIS D. HARMON to get
ready (collect money or advise his buyers) because
COLBERT was coming into town. However,
interceptions over [TT-2] also revealed that
COLBERT's anticipated cocaine shipment was
inadvertently sent by the supplier to other
customers in Tennessee.

With regard to the TREGGS/HUNTER DTO, Affiant is
advised that this DTO is allegedly responsible for
distributing approximately 1,500 pounds of
marijuana monthly in Dayton and Akron, Ohio,
through a trucking concern operated by JEREMY S.
DUNCAN. Affiant has learned that ANTHONY L.
TREGGS, as well as BRANCH, HUNTER, and DARRYL A.
COLBERT are current or past members of the CRIPS
Street gang out of Los Angeles, CA. According to
CS-5, TREGGS was in the Dayton, OH area meeting
with HUNTER in late December 2011. On January 30,
2012, TREGGS was intercepted over [TT-2] advising
BRANCH that he would be in town during that week.
Later that same day, DUNCAN, a courier for TREGGS,
was intercepted over [TT-2]. DUNCAN advised
BRANCH that he was in town and wanted to meet with
BRANCH. BRANCH met with DUNCAN at a warehouse in
the Akron, OH area. Based on intercepted
conversations over [TT-2] between BRANCH and
DERRICK WATSON, it appeared DUNCAN dropped off an
unknown, multi-pound quantity of marijuana to

26

BRANCH. Affiant has learned that TREGGS and
WATSON are stepbrothers, and are cousins of
BRANCH's wife, Carla Treggs.

Therefore, the overall objective of this request
for authority to intercept wire communications
over [TT-2], [TT-4], and [TT-5] is to: (1)
discover the identities and communications
facilities used by the drug associates of the
COLBERTS and BRANCH, with a primary emphasis on
COLBERT's dealings with his unknown California
cocaine supplier; (2) discover the identities and
communications facilities used by the drug
associates of TREGGS, DUNCAN, and BRANCH, with a
primary emphasis on TREGGS' dealings with his
unknown marijuana supplier(s); (3) uncover the
modus operandi of the COLBERT and TREGGS DTOs; and
(4) gain evidence to prove the connection,
participation, and role of all COLBERT and TREGGS
co-conspirators in the criminal activity – in a
concerted effort to completely dismantle the DTOs
of which they are a part.

### (a) necessity

Defendant argues that the affidavit fails to make an adequate showing of necessity.  In
fact, defendant asserts, the affidavit is weaker than the previous one given the government's
recent discovery of CS-6, who was able to provide a vast amount of valuable information
providing evidence against Darryl Colbert and Branch.  In particular, defendant attacks the
following portions of Porrini's affidavit.

Defendant asserts that the affiant falsely characterized defendant as a "known cocaine
trafficker out of California," although affiant had no first-hand knowledge but relied on the
information from CS-6.  Affiant falsely stated that in October 2010, Darryl Colbert was
stopped during an investigative traffic stop, and was found with over $10,000.00 cash and
what appeared to be "a drug ledger along with Hispanic names and bank account numbers,"

and that during the stop, Colbert provided a California driver's license with the name "Dale

Colbert."  Affiant falsely stated that Branch and Darryl Colbert were affiliated with the Los

Angeles, California based "East Coast Crips Street Gang."  These inaccurate statements,

defendant asserts, would have given Judge Oliver the impression that defendant was violent

and, therefore, traditional investigative techniques would have been too dangerous.

Defendant asserts that there is no mention of the use of weapons, violence, or violent

threats in any of the intercepted conversations.  And, although there is evidence that Colbert

and Branch had possessed firearms, there is no indication of violent behavior.

Defendant contends that the affidavit uses boilerplate language in asserting, "Given

the

totality of the circumstances involved in this case, it is not reasonably likely that the use of

traditional investigative techniques, in and of themselves, will conclusively identify the major

participants of this DTO, and result in sufficient evidence to prove the means by which the

marijuana and/or cocaine is delivered into the Akron, Ohio by this DTO." And likewise in

stating, "Traditional techniques have been tried and failed, or are too dangerous to employ, as

was thoroughly discussed in the previous affidavits authored by Affiant in support of Title III

authority. This situation remains."  Finally, defendant maintains that the affidavit uses

reasoning that could be argued in every type of criminal case when it states that "normal

investigative procedures have been tried and have failed to produce sufficient evidence to

successfully prosecute all of the persons involved, reasonably appear to be unlikely to

succeed if tried, or are too dangerous to employ."

Defendant points to the affiant's discussion of the traditional investigative techniques

28

and concludes that some were not even attempted and others were actually working.  For instance, surveillance in Akron of Branch and Darryl Colbert had been working, and other than one statement by Branch, the targets were not suspicious of being under surveillance. The government failed to conduct surveillance of the Colberts in California. With regard to confidential sources, CS-6 had been providing an extremely large amount of valuable information on both Branch and Colbert. Undercover investigation was not used even though CS-6 would have been in a position to be a point of access to Branch and/or Darryl Colbert. Despite the overall progress of the investigation, the development of suspects, and the amount of evidence being amassed, grand jury investigation was not attempted. Nor was the interviewing of suspects. The reasons given in the affidavit as to why toll records and pen register analysis would be difficult (i.e.,  the number of telephone contacts through pre-paid phones with no or inaccurate subscriber information, "seasoned drug traffickers" who avoid using telephones, change phones on a regular basis, or take precautions to avoid having the phone linked to them) would actually support an argument for not using a wiretap. The reason given for why trash searches would not work was already asserted in a previous affidavit, and the Colberts' trash was not searched in California although investigators knew their address. Search warrants were not attempted even though as of the time of this application, the government would have believed that there was sufficient probable cause for such.  And, the government would have known that Darryl Colbert was currently on parole in California, on a state case, and his home would have been subject to random searches by the California Parole Board.  Despite affiant's knowledge that cocaine was being shipped by Darryl Colbert and his brother Dale Colbert from Ortega's Polishing Shop in California to businesses in St. Louis,

Missouri and Gallatin, Tennessee, no traditional techniques were employed to target these businesses other than attempting to have a pole camera placed at Ortega's.

For the following reasons, the Court disagrees that the affidavit has not established necessity.  The affidavit sufficiently set forth the need for the wiretap:

> First, one of the primary goals of this investigation, when it began, was to confirm the drug dealing activities of DANTE L. BRANCH, identify his criminal associates and modus operandi, and gather sufficient evidence to prosecute (i.e., dismantle) the DTO(s) of which he was apart. Initially, a focal point of this investigation was BRANCH's relationship to a California to Ohio marijuana trafficking enterprise involving ANTHONY L. TREGGS, DENNIS S. HUNTER, and JEREMY S. DUNCAN. As the investigation unfolded, it was discovered that BRANCH also had current ties to a significant cocaine enterprise with multi-state ties, that is the DARRYL A. COLBERT and DALE E. COLBERT DTO. Both of the above referenced DTOs have links to the CRIPS Street Gangs of Los Angeles. While Affiant's investigation, and Title III interceptions to date, have revealed aspects of both the TREGGS/HUNTER DTO and the COLBERT DTO, additional investigation is needed. Given the sophistication shown by both DTOs to date, it is apparent that traditional investigative techniques alone will be inadequate to "infiltrate" the methods of operation of these enterprises and lead to the successful gathering of evidence and prosecution of the "driving forces" behind their respective operation.
>
> Based upon intercepted Title III conversations and CS information, Affiant believes DANTE L. BRANCH and DARRYL A. COLBERT have several telephones with which they conduct their drug business. Since DARRYL A. COLBERT's arrival in the Akron on January 26, 2012, only one pertinent conversation was intercepted between COLBERT and BRANCH over

[TT-2]. However, COLBERT was staying at BRANCH's residence, and they obviously had daily personal contact, which leads Affiant to believe any drug related conversation(s) were taking place in person, and there would be no reason to communicate drug related matters over the telephone. Affiant has confirmed that DARRYL A. COLBERT left the Akron area on February 13, 2012, and Affiant believes this will be the impetus for DARRYL A. COLBERT to telephonically reach out over [TT-4] and [TT-5] to BRANCH and his other associates - especially since the anticipated cocaine shipment into Northeast Ohio was inadvertently sent to Tennessee. At the time of this mishap (January 30, 2012), DARRYL A. COLBERT had telephonic contact with (909) 200-9030, user unknown, and (702) 281-8144, user unknown (see paragraph 35). Given the information from CS-6, the shipping history of Ortega's Polishing Shop, and the intercepted call between BRANCH and LOUIS D. HARMON on February 13, 2012 (in which BRANCH advised DALE E. COLBERT was expected to be in town shortly - see paragraph 63) it is likely another cocaine shipment will arrive within the next several weeks, and that DARRYL A. COLBERT and DALE E. COLBERT will facilitate that event through telephonic communications over [TT-4] and [TT-5].

Continued Title III authority over [TT-2] does not negate the request to commence interceptions over [TT-4] and [TT-5] for several reasons. First, DANTE L. BRANCH is known to have at least one additional telephone besides [TT-2], so that it is not certain that communications between the COLBERTS and BRANCH will be captured over [TT-2]. More importantly, interceptions over [TT-2] will not capture telephonic communication between DARRYL A. COLBERT and other criminal associates in Northeast Ohio, California, and elsewhere. Access to those communications is essential if Affiant and his colleagues are to expand the focus of the investigation to the COLBERTS' supplier(s) and other significant drug associates.

31

While there was earlier indication over [TT-2]
that DANTE L. BRANCH intended to focus on the
cocaine trade through the COLBERTS, and take a
brief respite from the TREGGS/HUNTER marijuana
organization, recent interceptions clearly
indicate that JEREMY S. DUNCAN dropped off an
unknown amount of marijuana to the club (1074 Bank
Street, Akron, Ohio) on or about January 30, 2012,
and that BRANCH and DERRICK WATSON have been
actively distributing multi-pound quantities to
various persons in the Akron area, with the
assistance of telephonic communication over
[TT-2]. Therefore, continued Title III authority
over [TT-2] is necessary to reveal the methods of
operation, and the identities of persons who are
involved in this marijuana trafficking endeavor.

The ongoing Tarver Title III investigation does not
negate the need for continued Title III authority
over [TT-2] and the initiation of Title III
authority over [TT-4] and [TT-5]. DANTE L. BRANCH
and TERRANCE TARVER are acquaintances, and have
had telephonic communication in the past; however,
CS-4 reported that he did not believe they
conducted narcotics transactions with each other
Furthermore, Affiant knows that TARVER has not been identified
in conversation over [TT-2] during the authorized
period of interception, and Affiant is advised
BRANCH has not been intercepted over the Tarver
Title III in drug related conversation. Thus
while they know each other, and have a common
friend (and drug associate) in LOUIS D. HARMON,
the drug dealing activity of TARVER and BRANCH are
completely separate and not connected.
Furthermore, there is no indication that TARVER
even knows the COLBERT brothers, other than what
HARMON may have told him about them. Through
surveillance, Affiant knows that DARRYL A. COLBERT
arrived into the Akron area on January 26, 2012,
and that he thereafter had a meeting with DANTE L.
BRANCH at BRANCH's residence. While BRANCH and
COLBERT were meeting, HARMON contacted BRANCH from
[TT-1], and also made arrangements to meet BRANCH
at BRANCH's residence. Later that day, after

32

leaving BRANCH's residence, HARMON placed a call
over [TT-1] to TARVER and advised TARVER they
needed to talk. TARVER and HARMON met in a
parking lot near TARVER's residence, and Affiant
believes it likely that the discussion was in
reference to the COLBERTS - but again, there is no
indication that TARVER and the COLBERTS (or for
that matter HARMON and the COLBERTS) have ever
been involved in narcotics transactions with each
other. Therefore, the ongoing TARVER Title III
does not affect Affiant's request - and need - for
Title III authority on [TT-4] and [TT-5]. In the
same vein, while interception of communications
over [TT-1] was helpful in establishing HARMON's
criminal involvement with TARVER and BRANCH, it
revealed that he relied upon them to actually
obtain the drugs - whether it be marijuana or
cocaine. Consequently, continued interceptions
over [TT-1] was not sought by Affiant, as it did
not (and could not) reveal TARVER or BRANCH's
efforts and methods of operation to obtain drugs
from their supplier(s), and it did not (and could
not) lead investigators to the identities of
TARVER and BRANCH's criminal associates. These
matters, though, reasonably can be discovered
through continued Title III authority on [TT-2],
and the initiation of Title III authority on [TT-4] and [TT-5].

Porrini followed with a discussion of the traditional investigative techniques and explained

why they had been, or were likely to be, ineffective in attaining the investigation's stated

goals.

Defendant does not acknowledge that two detailed case specific examples given by

affiant of surveillance of Branch and Colbert were offered to show this method's limitations.

Without intercepted communications, the mere observance of the targets or haphazard

following would have given little benefit to the investigation in the absence of any meaning.

Nor would investigators have known about the referenced meetings without the intercepted

communications. Porrini also explained why, although beneficial to some degree, surveillance had proved to be ineffective and while the pole cameras alone (without intercepted conversations) could not identify criminal activity.

Affiant discussed in detail why the use of confidential sources and undercover activity could not be successful. Defendant points out the benefits of CS-6, but affiant related that CS-6's information was "mostly historical in nature" and he owed money to the Colberts for past cocaine transactions. Also, Porrini explained that

> CS-6 has never been a position to know the inner workings of the COLBERT DTO, or all the players involved. CS-6 also has no information about customers in the Akron, OH area. While CS-6 may still be able to obtain general information about the COLBERT brothers' activities, it is not likely he can obtain specific information that touches upon the key aspects of their DTO.

Porrini pointed out that none of the other sources were in a position to introduce an undercover agent to the organization, and CS-6's information showed that the Colberts were very secretive about their organization.

Contrary to defendant's assertions, Porrini provided well-reasoned explanations as to why grand jury investigation would not work, and provided lengthy case specific examples as to why interviewing of suspects would be unlikely to succeed.

Defendant argues that the reasons given regarding the difficulties associated with toll records and pen registers would also apply to wiretaps. But, Porrini explained that these methods, unlike the wiretap, cannot identify the individuals participating in the phone conversation, the subject matter, or whether the conversation is innocent or with criminal purpose.

34

Likewise, trash searches and search warrants were thoroughly addressed.  Defendant's contentions in this regard fail to acknowledge that the investigators were in the Northern District of Ohio and their primary focus was on the operation of the DTOs in the Akron-Canton area.  And, as pointed out previously, he does not identify locations that could be searched.  As the government notes, defendant's assertion that search warrants would be fruitful is purely speculative.

In sum, the Court agrees with the government that while Darryl Colbert can hypothesize on how best to conduct a comprehensive and successful investigation, he cannot overcome the fact that Porrini's affidavit adequately details the investigative techniques that law enforcement had used prior to seeking the use of the wiretap, and the reasons why those techniques failed or were not likely to succeed, if used, in attaining the objectives of the investigation.  Rather, the affidavit was tailored to the investigation and gave Judge Oliver a substantial basis to find necessity for the wiretap.

**(b) probable cause**

Defendant also argues that the affidavit fails to contain probable cause for interception.  Defendant's argument centers on the fact that the affidavit relies on the new confidential source, CS-6, who defendant surmises is not credible or reliable.  Defendant points to Porrini's averment:

> Investigators with the FBI Safe Streets Task Force in Canton, Ohio, recently received information concerning the personnel and operation of an illegal narcotics business from an undisclosed individual, hereinafter referred to as CS-6. CS-6 has a drug-related criminal history. Canton investigators believe CS-6's information to be reliable because the information and assistance provided by CS-6 was corroborated by

35

independent investigation by the FBI, DEA, other law
enforcement officers, and by other information
furnished to the DEA, FBI and other law enforcement by
other confidential sources and witnesses. CS-6 is
attempting to receive consideration on federal
sentencing, though no charges have been filed. CS-6
has been familiar with some of the targets of this
investigation through a drug/criminal relationship.

Over the course of two paragraphs, Porrini outlined the information provided by CS-6

relating to the Colberts: The Colberts had been importing large amounts of cocaine to the

Canton-Akron area from California since 2010, of which CS-6 has witnessed nine or ten

loads.  The Colberts have engine blocks, concealing 10-15 kilograms of cocaine, delivered to

warehouses in the area from a location in California.  The bills of lading show the shipper as

Ortega's, referenced above. X-ray type vests line the engine blocks.  The cocaine is removed

by one of the brothers and distributed. The engine blocks are then loaded with the currency

profits and shipped back.  CS-6 was receiving 5 kilograms from each load, with the rest being

distributed to unknown persons in the area.  The same type of shipment is arranged by the

Colberts to unknown destinations in St. Louis and Tennessee.  The Colberts live in California

and come to Ohio when a shipment is arriving or money is being sent back to California. On

January 27, 2012, CS-6 reported to investigators that he had been contacted by one of the

Colbert brothers and advised that he was coming into town in the next few days.  When

previously so notified, cocaine showed up soon thereafter.  CS-6 does not know the location

of where the cocaine would be delivered.  On January 27, 2012, CS-6 received a call from

Darryl Colbert who said that he was in town and needed to see CS-6 about the money he

owed the brothers.  In the presence of law enforcement, CS-6 placed a call to Darryl Colbert

on January 31, 2012.  Colbert told CS-6 he was in Akron and would be leaving on February

36

13, 2012. Conversations and text messages between the two occurred regarding money owed by CS-6.

Defendant contends that CS-6 is not credible and is unreliable, and that his information that Darryl Colbert is shipping the cocaine from California is false.  Defendant asserts that the affidavit shows that CS-6 is a large scale drug trafficker who is attempting to ameliorate his own potential prison sentence arising for federal charges. Defendant surmises that CS-6 himself could have been behind the operation described, and there is no corroboration that Darryl Colbert was involved. Defendant also suggests that possibly the government initially confronted CS-6 with his involvement in the Akron area cocaine trafficking and mentioned Darryl Colbert, and that CS-6 decided to help himself by naming a person who investigators already suspected may be involved.  In sum, defendant maintains that CS-6 is unreliable as to who was shipping the cocaine from California to Ohio.

For the following reasons, defendant's assertions are insufficient to show that the affidavit lacks probable cause.

The portion of the affidavit pertaining to probable cause consists of 37 paragraphs and is divided into four sub-sections: historical information, the information provided by CS-6, additional information concerning Ortega's Polishing Shop, and intercepted Title III conversations.  These sections show corroboration of  CS-6's information.  Investigators confirmed shipments of the engine blocks from Ortega's to a Canton business, and discovered that Ortega's was sending similar deliveries to businesses in Tennessee and Missouri.  Porrini intercepted a conversation on January 30, 2012 which he believed revealed that the shipment of cocaine meant for the Akron-Canton area was sent to Tennessee instead.  Porrini reviewed

shipping records from Ortega's to the Tennessee entity which showed a shipment was sent

from Ortega's to that entity on January 26, 2012. Intercepted conversations were summarized

by Porrini:

> ... Recent conversations over [TT-1] and [TT-2] suggest the
> COLBERT brothers arranged for a shipment of cocaine to
> arrive in the Akron/Canton area, and that DANTE L.
> BRANCH was to have received a portion of that shipment.
> Affiant believes the original shipment headed to the
> Akron/Canton area was inadvertently diverted to
> Tennessee, but anticipate that another shipment will be
> headed towards Akron/Canton area within the next
> several weeks. Affiant believes BRANCH will again
> receive a portion of the shipment and distribute the
> cocaine he receives from the COLBERT brothers to or in
> conjunction with LOUIS D. HARMON and DERRICK WATSON.
> Furthermore, recent intercepted conversations over
> [TT-2] suggest JEREMY S. DUNCAN made a delivery of
> marijuana to BRANCH and WATSON, and made arrangements
> for a future delivery. Intercepted conversations
> indicate TREGGS also made plans to see BRANCH in the
> near future. Affiant believes TREGGS will meet with
> BRANCH to discuss payment for the recent shipment and
> make arrangements for the future delivery.

Defendant's attempt to undermine probable cause by attacking the credibility and

reliability of CS-6 is untenable.  The affidavit stated why CS-6 was qualified as a reliable

source and provided other information supporting probable cause.  The affidavit, viewed in its

totality, contained a substantial basis for Judge Oliver to conclude that a "fair probability"

existed that evidence of drug dealing would be secured from the requested warrants.  *See U.S.

v. Alfano,* 838 F.2d 158 (6th Cir. 1988) (citations omitted) ("[C]ertainty is not required at this

stage, and the exact quantum of support required has frequently been described as 'a fair

probability,' but more than a 'mere suspicion,' that such evidence will be discovered. Facts

can amount to a fair probability without being proof beyond a reasonable doubt or even a

prima facie showing.") Since it has been recognized that "the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time," great deference must be paid to his determination. *Id.* Further, while reasonable minds may differ on the issue of probable cause, "the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Id.*

### (iii) March 19, 2012 Order

Based on the discussion above, the government showed the requisite necessity in obtaining this Order.

### (iv) May 3, 2012 Order

Judge James Gwin issued the Order of May 3, 2012 authorizing the renewed interception of Dante Branch's wire communications and the initial interception of those of Jeremy Duncan and Dale Colbert. (Government Ex. 6) As discussed below with regard to Jeremy Duncan's challenge to this Order, necessity was established.

### (v) *Franks* hearing

Defendant sets forth the applicable law:

*Franks v. Delaware*, 438 U.S. 154 (1978) stands for the proposition that when a defendant makes a "substantial preliminary showing that a false statement is (1) "knowingly and intentionally, or with reckless disregard for the truth,…..included by the affiant in the warrant affidavit" and (2) necessary to the finding of probable cause", the Fourth Amendment entitles the defendant to a hearing. If at that hearing, the Defendant demonstrates by a preponderance of the evidence that the above are in fact true, "the search warrant must be voided and the fruits of the search excluded as if probable cause was lacking on the face of the affidavit." Although an affidavit which omits potential exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information, material omissions, as opposed to affirmatively false statements, included in an affidavit, are not immune from inquiry under *Franks*. *United States v. Atkin*, 107

F.3d 1213, 1217 (6th Cir. 1997).

Defendant maintains that his previous assertions regarding false statements contained in the affidavits as well as the factual omissions were relevant to a finding of probable cause and that the warrants were necessary because other methods would have been too dangerous.

Defendant does not make a substantial preliminary showing because he does not offer proof that the statements were false and he does not analyze the affidavits without the statements. As to the omitted information regarding violent behavior, Porrini did not argue that the subjects were violent and, therefore, the alleged omissions would not have affected the determinations of necessity and probable cause.  For these reasons, and those explained by the government in its brief, defendant is not entitled to a *Franks* hearing.

For the foregoing reasons, defendant Darryl Colbert's Motion to Suppress Title III Wiretap Evidence with Request for Franks Hearing is denied.

### (C) Jeremy Duncan's Motion to Suppress His Intercepted Cell Phone Conversations

Defendant Jeremy Duncan challenges necessity and probable cause in the supporting affidavit of the May 3, 2012 Order issued by Judge James Gwin authorizing the renewed interception of Dante Branch's wire communications and the initial interception of those of Jeremy Duncan and Dale Colbert (second telephone). (Government Ex. 6)[4]

### (i) necessity

---

[4]       Defendant also challenges the January 20 and March 19 Orders which intercepted his phone conversations.  Those Orders have been upheld, as discussed above. Additionally, the Court adopts the reasoning of the government in its discussion of necessity.

Defendant asserts that the affidavit lacks specific facts as to this defendant establishing that  normal investigative procedures had been tried and had failed, or reasonably appeared unlikely to succeed if tried, or appeared too dangerous. Defendant argues the following as to each of the traditional investigative methods which were addressed by Porrini in his affidavit.

The affidavit claims that physical surveillance of Dante Branch and Darryl Colbert had been conducted, but does not state to what degree. The statement of inherent limitations of this technique is merely generic.  Nor does the affidavit detail the extent of any following of  Duncan. The affidavit's statements as to why affiant considered physical surveillance to be too risky did not relate to Duncan.

The affidavit describes that a pole camera was installed at Dante Branch's car wash and was effective in capturing Harmon and Colbert meeting together. The affiant then claims that a wiretap is necessary because "the mere observation of individuals entering or leaving a premise is not conclusive of criminal activity." But, this is an inherent limitation of pole cameras, and the technique was successful in that it achieved its purpose in capturing a meeting between two alleged criminal suspects. While the affidavit states that the use of pole cameras may be of assistance but fails as a single technique to provide the necessary evidence, this is not a ground to approve a wiretap. Nor does the affidavit mention any attempt to use a pole camera to record Duncan's activities.

The affidavit indicates that because a single technique does not provide all of the evidence on its own to secure a conviction, a wiretap should be authorized. The affidavit indicates that GPS cell site tracking of the suspects had been successful, but that physical

location of the targets alone is insufficient to reveal actual criminal conduct.  This is only an inherent limitation of a single investigative technique.  The affidavit recognized that this technique has been attempted with respect to Duncan and was successful.

GPS tracking of vehicles was not proven to be unsuccessful by one suspect's suspicion, and the affidavit makes no real argument as to why this technique would be unsuccessful as to Duncan.

As to confidential sources and undercover agents, the affidavit reveals that CS-5 is providing information on the activities of Duncan and does not state any limitations with the exception that the informant is not in a position to make a controlled purchase of drugs from defendant.  The affidavit indicates that CS-5 successfully infiltrated the conspiracy, and nothing indicates that this investigatory technique has been unsuccessful or is too dangerous. Nor does the affidavit mention specific efforts to develop a confidential source with respect to defendant.

The affiant rejects the possible use of the grand jury subpoenas and search warrants, without any analysis or specificity with respect to defendant. No mention is made as to why CS-5, who is already cooperating, could not be called to testify in front of the grand jury. The same is true of all of the other confidential sources. The boiler plate rejection of grand jury subpoenas fails to establish that this investigatory techniques was reasonably unlikely to work as to defendant.

While the affidavit rejects search warrants as being likely to reveal the investigation to its targets, this does not reasonably explain why this tool is unlikely to succeed in this particular investigation.

42

Likewise, witness interviews were not attempted and the affidavit contains no meaningful analysis of this technique with respect to defendant. The fact that affiant believes it is not likely to succeed because the evidence is not strong enough to convince suspects to talk is not persuasive given that the affidavit states that the earlier drug seizures and Title III interceptions are "compelling evidence" against a large number of people.

As to search warrants, the affidavit states that the location of "the Club" has been identified as believed to be where marijuana is delivered, stored, and processed.  While the affidavit claims not to know when marijuana would be delivered to this location by defendant without the wiretap, affiant fails to explain why it would be difficult to simply surveil the Club to determine when defendant's vehicle arrives and secure a warrant to search it and the premises. The affiant claims that executing search warrants would serve to alert the suspects of the investigation, but prior to the execution of the affidavit the government seized 17 kilograms of cocaine, $50,000 in U.S. currency, and 25 pounds of marijuana.  In light of these seizures, it is unreasonable and inexplicable for the affiant to assert that execution of search warrants would be of no use because they would alert targets of the investigation. Moreover, nothing specifically addresses defendant.

For the following reasons, the Court disagrees that the affidavit was lacking in its demonstration of necessity.

As with the previous affidavits, Porrini began by summarizing the status of the ongoing investigation as to the Colbert DTO and the Treggs DTO, of which Jeremy Duncan was a part.  As to the latter, the affiant stated:

> With regard to the TREGGS DTO, DANTE L. BRANCH and
> ANTHONY L. TREGGS were intercepted in a telephone conversation

43

over [TT-2] on January 30, 2012, in which TREGGS advised BRANCH
that he would be in town (Akron) during that week. Later that
same day, JEREMY S. DUNCAN, a courier for TREGGS, was intercepted
over [TT-2]. DUNCAN advised BRANCH that he was in town and
wanted to meet with BRANCH. BRANCH met with DUNCAN at "the
Club," a warehouse located at 1074 Bank St., Akron, OH. Based on
intercepted conversations between BRANCH, using [TT-2], and
DERRICK WATSON, using [TT-8], it was apparent that DUNCAN dropped
off an unknown, multi-pound quantity of marijuana to BRANCH and
WATSON. Additional intercepted telephone conversations suggested
BRANCH was expecting another shipment from TREGGS/DUNCAN during
the second or third weeks of March. Intercepted calls over
[TT-2], [TT-7], and [TT-8] indicated that BRANCH, WATSON, DUNCAN
and FNU LNU #7 arranged for a shipment of an unknown amount of
marijuana from California to Akron, OH that arrived in Akron on
March 29, 2012. Surveillance units observed BRANCH and DUNCAN
meet at 1074 Bank St., Akron, OH to complete the delivery.
Additionally on April 06, 2012, TREGGS was intercepted over
[TT-2] advising BRANCH (who was in California, visiting with
TREGGS' father) to come to his residence, "I got something for
you." TREGGS then asked his father to show BRANCH what TREGGS
had given to his father (marijuana) and advised, "I got a whole
lot." Affiant knows that DUNCAN is currently using [TT-9], a
cellular telephone activated on September 13, 2008, and serviced
by T-Mobile, along with an unknown new cellular telephone.

Porrini addressed the need for continued interception which was tailored to the current need

with regard to the Treggs DTO:

While there is significant evidence that the TREGGS DTO
has been involved in two marijuana deliveries to Akron during
2012, investigators have not been able to interdict any marijuana
and/or drug proceeds~ Consequently, investigators can offer only
an educated guess as to the amount of marijuana involved in these
two deliveries, which appear to have been shared by DANTE L.
BRANCH and DERRICK WATSON. BRANCH and WATSON seemingly have
separate customer bases. BRANCH's level of local dealing
suggests the loads may have been in the 50-100 pound range -
although that might be a little on the light side, given the
source information about the DTOs historical trafficking
practices in the Dayton area (1500 pounds per month), and the use
of a tractor-trailer to transport the marijuana (which would
suggest larger, rather than smaller shipments). Furthermore,

44

while ANTHONY L. TREGGS has been recently implicated through wire
interceptions as a California point of contact, investigators
cannot be sure of this, especially given the unknown identity and
role of FNU LNU #7, who appears to have arranged the
transactions. Affiant and his colleagues attempted to
"infiltrate" the TREGGS DTO through court authorized wire
interception of DERRICK WATSON's [TT-8]. However, that was
mostly a dead-end as [TT-8] was revealed to be an "anchor"
telephone with which WATSON conducted mostly legitimate and
family business (and a lot of it). It was apparent through
interceptions over [TT-8], and BRANCH's [TT-2] and [TT-7], that
the main members of this DTO principally use "drug phones" or
"work phones" that they obtain in unison. Through Title III
interceptions and toll analysis, Affiant knows that the group
just obtained new (and presently unknown) cellular telephones
with which to conduct their drug trade. Affiant's request for
Title III authorization for DUNCAN's [TT-9] is necessary because
even though it is an "anchor" telephone, he seemingly uses this
"anchor" telephone more frequently for drug related matters than
his cohorts use their "anchor" telephones. Moreover, BRANCH and
WATSON have called DUNCAN "the key" to their marijuana
trafficking activities, and wire interceptions over [TT-9] may
offer the best opportunity at interdicting a load being delivered
by DUNCAN, which would not only provide compelling evidence of
wrong-doing, but also give good indication as to the scope of the
illegal activity.

Affiant's request to intercept wire communications over
[TT-9] is not negated by his request to renew Title III
interceptions over BRANCH's [TT-2], and vice versa. As stated,
BRANCH, DUNCAN, WATSON, and presumably ANTHONY L. TREGGS and
FNU LNU #7 have recently obtained new "work phones." While BRANCH
has displayed much more discipline in using the designated "work
phone" for business dealings with members of the TREGGS DTO, he
nonetheless actively uses [TT-2] in communication with local customers, with the
COLBERT twins, and most recently (during          April), with a new marijuana
                                                  supplier,
FNU LNU #6. Therefore, renewed Title III authority on [TT-2] will further reveal
BRANCH's criminal associations and/or confirm aspects of his drug
dealing activities. It will also provide investigators with an
opportunity to intercept cocaine and/or marijuana that he may
secure from his multiple sources. Finally, as BRANCH is the
linchpin which connects the two DTOs, renewed interception of
communications over [TT-2] will greatly assist investigators as

45

the final "take down" of these DTOs is planned and executed.
Affiant then discussed the limitations of traditional investigative techniques, noting their limitations and providing case specific examples.

Defendant challenges the amount of physical surveillance to which he was subjected to and the lack of GPS tracking of his vehicle, but the affidavit shows that a GPS tracking of his cell phone was obtained. Porrini noted, "The data is assisting surveillance units in locating [the targets]. This has been of some value (and will be of greater value upon 'take down' to these DTOs); however, the physical location of these persons alone is insufficient to reveal actual criminal conduct. Again, it is only through the context of intercepted conversations that meaning is derived from the location of these individuals."

With regard to confidential sources, Duncan states that the affidavit indicates that CS-5 has successfully infiltrated the Treggs DTO, but the affidavit does not appear to so indicate. Rather, the affiant states that while this source's information as to Duncan has been useful, it has not been sufficient to lead to the attainment of the investigation's objectives and "CS-5 is not in a position to contact, meet or converse directly with any of the Target Subjects operating in the Akron, Ohio area. Although CS-5 is able to obtain general narcotics related information, he is not in a position to make controlled buys from either HUNTER or DUNCAN."

Defendant contends that interviews could have been successful, and that the affidavit states that as a result of the Title III interceptions compelling evidence had been obtained against a large number of people. But, while that was the case as to the Colbert DTO, affiant stated that it was not the case as to the Treggs DTO of which defendant was a part:

46

... The evidence regarding the TREGGS DTO is not substantial at this time, and
consists almost entirely of general information provided by CS-5, and a number of
Title III interceptions. These interceptions revealed that BRANCH and
DERRICK WATSON were in possession of an unknown (but significant)
amount of drugs, which Affiant believes to be marijuana, that
was delivered by JEREMY S. DUNCAN to "the Club" on January 31,
2012 and March 29, 2012. Affiant does not believe approaching
any of the known principals of the TREGGS DTO at this time - and
under these circumstances - would be fruitful. The evidence is
not fully developed, and the potential penalty associated with
the January and March deliveries (if a prosecution could be
brought) is not of the severity that would reasonably motivate
DUNCAN, BRANCH, WATSON, or TREGGS to cooperate against their
associates, especially given the strong gang and family
relationships that exist between the known members of this DTO.

As to the viability of search warrants, defendant suggests that investigators could have
done surveillance on the Club to determine when his vehicle arrived and then obtain a search
warrant for the vehicle and the premises.  But, the government points out that there is no
indication of whether Duncan actually was, or was reasonably likely to be, in possession of
marijuana.  Nor is there a discussion of whether there was probable cause to search the
location at that particular time.

In sum, the affidavit provided Judge Gwin with a substantial basis to find the necessity
for the wiretap.

**(ii) probable cause**

Defendant argues that probable cause is erroneously based on the casual rumors of
CS-5 who knew nothing about Duncan, and intercepted phone conversations which are
subjectively, and wrongly, interpreted by the affiant.  But the affidavits reveal that Porrini was
an extremely experienced and accomplished narcotics investigator who could reliably
interpret the conversations.  Judge Gwin acted within his discretion in accepting the Agent's

interpretations of the calls.  For purposes of a probable cause determination, Judge Gwin had

a substantial basis to conclude that Duncan was involved in criminal activity.  A common

sense reading of the affidavit in its entirety would have shown that Porrini's background

knowledge gave him a reasonable belief that defendant was engaging in criminal activity.[5]

### (D) Antowan Logan's Motion to Suppress His Intercepted Communications and Motions to Join filed by Darin Wright and Wesley A. Black

These defendants rely on the previously asserted and rejected arguments and,

therefore, their motions are denied for the reasons stated herein.

### Conclusion

For the foregoing reasons and those stated by the government in its brief, all motions

to suppress intercepted communications and wiretap evidence are denied.

IT IS SO ORDERED.


        /s/ Patricia A. Gaughan          
        PATRICIA A. GAUGHAN
Dated: 3/13/13        United States District Judge

---

[5]      To the extent Duncan also challenges probable cause in the previous affidavits, these assertions are likewise rejected for the reasons stated by the government in its brief.